DECISION
This Court conducted a bench trial with respect to multiple claims for damages and breach arising out of a contract for electrical work at the Port of Galilee, Narragansett, Rhode Island. The State of Rhode Island ("State"), through its verified complaint, brings this action for breach of contract, negligence, breach of warranty for fitness of a particular purpose, and breach of performance bond against co-defendants, SJV Electric, Inc. ("SJV") and National Grange Mutual Insurance Co. ("National Grange"). Defendants raise a number of affirmative defenses and counterclaims, including breach of contract and negligence. During trial, SJV and National Grange moved for judgment as a matter of law pursuant to Super. R. Civ. P. 52(c), which motion is addressed in this decision.
 I Facts Travel
During trial, the Court heard testimony from a number of witnesses and received into evidence a number of exhibits including documents and sample electrical cables. The Court finds the following facts by a preponderance of the credible evidence presented at trial. The *Page 2 
contractual relationship between SJV and the State, around which the matter at bar is centered, began with an October 1998 Bid Solicitation by the State for the Port of Galilee Electrical Renovation Project ("Project"). SJV submitted a timely bid and ultimately was determined to be the lowest bidder. (Verified Compl. ¶ 6.) (Compl.) SJV subsequently procured and presented the State with its surety bond, in which co-defendant National Grange agreed to serve as surety. (Ex. 6.) The contract as agreed upon by the parties called for the State to make partial payments periodically throughout the progression of the Project. (Ex. 7; Ex. 1, art. 5.)
The Project was initiated for the purpose of renovating wiring and electrical lines previously installed in the docks at Galilee, in Narragansett, Rhode Island. The individual docks, primarily used for egress and ingress of commercial fishing boats, are powered predominantly by ampere feeder cables which draw power from the two main distribution panels. The distribution panels serve as the main power hubs for the entire electrical system for docks in the Port.
SJV's contract with the State called for the installation of 200 ampere feeder cables. It is undisputed that in April of 1999 employees of SJV used a backhoe to attempt to pull the feeder cables through conduit already placed in the ground by SJV. (Ricci Test.) Specifically, the plans contemplated the use of one-inch PVC conduit to be laid in the ground. The PVC would ultimately serve as raceways to facilitate an expedited installation of the replacement cables, which proved to have a longer than expected lead time from the supplier used by SJV. The State's plans and specifications for the Project, which were developed and drawn by Powers Engineering, Inc. ("Powers"), called for the use of bronzed sheath Okonite cable. (Ex. 1.)
As a result of the delay in obtaining the Okonite cable, a series of letters and faxes were exchanged between the parties involved in the Project. SJV repeatedly expressed its concerns regarding the National Electric Code ("NEC") fill requirements once SJV was made aware of the *Page 3 
dimensions of the raceways and the Okonite cable.[1] The State, however, insisted throughout the course of its relationship with SJV that their engineers had determined that the original plans were not violative of the NEC fill requirements. Ultimately, the State and SJV were unable to resolve their issues surrounding the Project which prompted the State to terminate its contract with SJV. Thereafter, the Project was re-bid and ultimately awarded to K-Electric, which had been an unsuccessful bidder on the Project in the fall of 1998. Mr. Kirk, the principal of K-Electric, testified that K-Electric was given the option to use or discard any of the work already done on the Project by its predecessor, SJV. To avoid any potential liability on work that was not their own, K-Electric opted to replace the cables installed by SJV costing the State an additional $20,000. The State also contracted with Powers once again to develop Addenda No. 2, which altered the original plan specifications. (Trial Ex. 10.) Addenda No. 2 instructed the replacement contractor, K-Electric, to employ a direct burial method[2] when laying the Okonite cable, rather than use the PVC conduit raceways previously laid by SJV. (Trial Ex. 10.)
Subsequent to K-Electric's take-over of the Project, National Grange Insurance Company ("National Grange"), a co-defendant in this litigation, in its capacity as surety under the SJV Performance Bond, requested that Megger Testing[3] be performed at the project site. The tests were performed in October of 2000. PI Associates, agents of National Grange, hired James J. *Page 4 
O'Rourke, Inc. ("O'Rourke") to conduct the testing. The tests were subsequently performed by Joe Walsh, Jr. of O'Rourke, who testified to the results of the testing at trial. As will be discussed in greater detail below, 11 wires failed the Megger Testing. (Trial Ex. 34.)
At the request of the Court, the State, following trial, filed proposed findings of fact and conclusions of law in addition to their written closing arguments. SJV has also filed its written closing argument. The Court notes that the facts presented and proposed in the various filings appear to mirror each other and are generally undisputed. Finally, the above-stated introductory facts will be supplemented with additional, specific findings of fact as they relate to the Court's decision herein.
 II Standard of Review
The court decides non-jury trials pursuant to its power under Super. R. Civ. P. Rule 52. The R.I. Rules of Civil Procedure provide that "in all actions tried upon the facts without a jury or without an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon." Super. R. Civ. P. Rule 52. Under Rule 52, the Court sits not only as trier of law, but also as trier of fact.See Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). When sitting as the trier of facts, the trial justice determines the credibility of witnesses and ultimately may draw proper inferences from the evidence. (See Id.) Finally, an extensive analysis and discussion of the evidence and testimony is not required to comport with the mandates of Rule 52. (Id.) *Page 5 
 III The Written Agreements
The rights and obligations of the parties are governed by two primary documents: (1) the Construction Contract ("Contract") and the conditions thereto[4], which consists of both AIA Document A101-1997 and AIA Document A201-199, and (2) the Performance Bond. The form of each of these documents was provided to SJV as Part of the Project manual.
A. The Contract and Conditions
The controversy among the parties centers primarily on the State's termination of the Contract with SJV. Termination procedures are set forth in Article 14 of AIA Document A201-1997.[5] Section 14.2.1 of the Conditions states the reasons for which the owner may terminate the contract for cause; that is, if the contractor:
 1. persistently or repeatedly refuses or fails to supply enough properly skilled workers or proper materials:
 2. fails to make payment to Subcontractors for materials or labor with the respective agreements between Contractor and the Subcontractors:
 3. persistently disregards laws, ordinances, or rules, regulations or orders of a public authority having jurisdiction: or
 4. otherwise is guilty of substantial breach of a provision of the contract documents. (Trial Ex. 1.)
The provisions further dictate the procedure to be followed by the owner should one of the above mentioned causes be present on a project. Section 14.2.2 states in pertinent part that: *Page 6 
 [w]hen any of the above reasons exist, the Owner, upon certification by the Architect that sufficient causes exists to justify such action, may without prejudice to any other rights or remedies of the Owner and after giving the Contractor and the Contractor's surety, if any, seven days written notice, terminate employment of the Contractor and may, subject to any prior rights of the surety:
 1. take possession of the site and all materials, equipment, tools, and construction equipment thereon owned by the Contractor;
 2. accept assignment of subcontracts pursuant to paragraph 5.4; and
 3. finish the Work by whatever reasonable method the Owner may deem expedient. (Id.)
 B. The Performance Bond
The Performance Bond provided to the State in connection with this Project also set forth provisions to be followed in the event the Owner wishes to declare Contractor in default. Specifically, the provisions in section 3 of the Performance Bond state the terms by which the surety, co-defendant National Grange, becomes obligated under the bond. Section 3 reads:
 If there is no Owner Default, the Surety's obligation under this Bond shall arise after:
 3.1 The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and
 3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's rights to complete the contract, Such Contractor Default shall not be declared earlier than *Page 7 
twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and
 3.3 The Owner has agreed to pay the balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.
 IV Findings of Fact
The State has provided the Court with a listing of proposed findings of fact, most of which are not in dispute in the arguments put forth by the defendants in their closing memorandum. In fact, the documents provided to the Court present very little disagreement as to the sequence of events which led to the State's termination of SJV's contract. As set forth above in the preliminary summary of facts, the Contract called for renovations to the electrical work at Galilee. Initially, the Project was slated to span a four-month period, and to be completed as expeditiously as possible to facilitate the use of the docks by the commercial fisherman and others who use the Port of Galilee. Multiple delays in the availability of the Okonite cable, as well as disputes over payment and workmanship technique resulted in delay and even the periodic suspension of work. Ultimately, the issue of SJV's "non-performance" caused the State to terminate SJV's right to complete the Project on May 25, 2000. (See Trial Ex. 10, "Notice of Termination.")
The dispute herein focuses primarily on three portions of the work at Galilee. The State called into question, first, the workmanship techniques employed by SJV to install the 200 ampere feeder cables and to mount the distribution panel doors; second, the significant delays caused by the long lead-time for the Okonite cable specified by Powers in the plan details; and third, the dispute that ensued as to whether the Okonite cable would comport with the NEC fill *Page 8 
requirements. Additionally, a dispute arose following the October 2000 Megger Testing, which was conducted after the SJV contract had been terminated and K-Electric had begun its work as the replacement contractor. Each of these issues will be discussed in turn as they relate to the State's purported right to terminate SJV under the contract terms.
A. Workmanship Technique 1. Feeder Cables
The installation method of the 200 ampere feeder cables installed by SJV was the cause of great contention throughout the trial. Specifically, testimony at trial revealed that SJV, had at one time, used a backhoe to attempt to pull the 200 ampere feeder cables through the underground conduit. The State presented witnesses who testified that this backhoe pulling method could have caused damage to the insulation and could have resulted in the failure of the feeder cables. Joseph Doucette, P.E., the State's electrical engineering expert, stated that the backhoe technique employed by SJV at the Galilee docks would be violative of the 1996 NEC if it had caused the damage. The State was unable, however, to prove that the use of the backhoe did in fact damage the cables. While Mr. Doucette could not definitely state that the NEC had been violated, he opined that the backhoe pulling method did not satisfy the standard of care to which electrical contractors are held in the industry.
As a result of the above stated testimony and sequence of events, the State asks this Court to conclude as a matter of law that SJV's installation of the 200 ampere feeder cables "violated the NEC, did not comply with the Project specifications, did not meet the industry standard of care, and was negligent workmanship." (State's ProposedFindings of Fact and Conclusions of Law.) The Court declines so to do. *Page 9 
As the Defendant aptly points out, the State failed to demonstrate to the Court which of the feeder cables were pulled with the backhoe. Moreover, while Mr. Doucette testified that the NEC may have been violated by such a technique, when handed a copy of the code book, the State's expert witness was unable to point the Court to a section to support this opinion. In fact, Mr. Kirk testified that he was unaware of specific damage to the cables and that damage was not the reason for the replacement of the already installed cables. In sum, the State was unable to establish any actual damage done to the feeder cables.
2. Distribution Panels
In addition to the techniques used to install the ampere feeder cable, the State raised concerns as to how SJV mounted the distribution panels on the dock posts. The State offered testimony, through Mr. Kirk of K-Electric, as well as their expert Mr. Doucette, to establish that SJV was negligent and mounted the panels in violation of the NEC. Specifically, the State asks the Court to find that the Distribution Panel 1 was mounted in such a way that prevented the panel door from opening a full 90 degrees, as is required under the NEC. (Trial Test. Mr. Ricci.) The State also presented evidence to the Court that the dock power centers were not mounted at the appropriate height on the dock posts. (Id.) The Court notes, however, that the power centers were mounted on pre-existing dock posts, which had been installed by state employees. As a result, the height at which the power centers could be mounted was a limitation beyond SJV's control. (Trial Test. Mr. Viveiros.)
Mr. Kirk's cross examination shed light on the issues surrounding the distribution panels. Specifically, he testified that SJV had in fact installed the panels in accordance with the original Project specifications. (Trial Test. Mr. Kirk.) Moreover, Mr. Kirk testified that the panel board *Page 10 
installation specifications found in Addenda No. 2 constituted a change from the original plans.[6] (Trial Ex. A.) The Court herein adopts Mr. Kirk's testimony and finds that SJV was not negligent in its installation of the distribution panels or dock power centers. Additionally, the Court is cognizant of the ease with which the height of the power centers could be adjusted, requiring merely a screwdriver and a few moments of work. Finally, the replacement contractor, K-Electric, agreed with the Defendant, SJV, that the distribution panels were installed in accordance with the plans with which they were provided. As a result of the above, the Court finds that Plaintiff's claims of negligent workmanship pertaining to the distribution panel doors and the power center heights are without merit.
3. Okonite Cable and Addenda 2
The Project specifications drawn and compiled by Powers contemplated the use of a bronze-sheath cable manufactured by the Okonite Company. The issues surrounding the Okonite cable, Trial Exhibit 8, were the cause of the majority of delays in the Project. Initially, the delay in receiving the cable from SJV's supplier was the cause for concern as the State was trying to expedite the Project to the greatest extent possible. The supplier initially sent the wrong cable and it had to be re-ordered. To expedite the installation once it was received, SJV was instructed to and did install a raceway system constructed of one inch PVD conduit. Mr. Powers testified at trial that he was aware of the long lead time and took that into account when the raceway system was specified for the Project. In fact, the raceway system was specified so as to allow for the expedited installation of the Okonite cable upon its receipt and ultimately to avoid any further delay in the work. When the cable first arrived, however, SJV was unaware that its *Page 11 
supplier had sent the wrong cable because at the time of delivery, June 1999, the Project had been shut down by SJV because of non-payment by the State.
Upon inspecting the cable in August of 1999, Mr. Vivieros determined that the diameter of the Okonite cable would not fit in the one-inch PVC conduit. As the State points out, the Contract provisions require the Contractor (SJV) to make the Owner aware of any possible code violations upon reviewing the plans and materials. (Trial Ex. A.) Mr. Vivieros attempted to make the State aware of his concerns on multiple occasions in writing, as well as oral communications with State agents. (See,e.g., Aug. 23, 1999 Letter from SJV to Walter Powers.) Once the State was made aware of these concerns, the DEM did a test pull of the Okonite cable that fed one of the power panels on the site. Mr. Ricci, of the DEM, testified that State workers were able to pull the Okonite cable through a portion of the previously installed PVC conduit after lubricating the cable.
The Court finds that the installation of the Okonite cable in the one-inch raceways would have violated the NEC fill requirements. (NEC, at Table 1, Ch. 9.) Moreover, the Court accepts Mr. Vivieros' testimony that pulling the cables through the PVC conduit may have caused significant damage to the cables, which would also be in violation of the NEC. The State, nonetheless, insisted that SJV install the cable in this manner and upon SJV's refusal to do so, the Project was at a stand still. Unable to come to a resolution, the State terminated SJV's contract and ability to complete the work at Galilee through a Notice of Termination letter addressed to Scott J. Vivieros. The letter, dated May 25, 2000, was also copied to Richard Butin of National Grange.
The State's replacement contractor, K-Electric, was instructed not to use the PVC raceways that had been shown in the original plans. (Trial Ex. A, Trial Test. Mr. Kirk.) In fact, *Page 12 
on August 11, 2000, and nearly three months after terminating SJV's contract, the State issued Addendum No. 2 providing for plan revisions. (Trial Ex. A.) Notably, the addendum no longer directed the contractor to use a raceway system. (Id.) The Okonite cable, according to this addendum would be laid in the ground using a direct burial method. (Id.) The Court notes that this is in line with the NEC requirements. (See Supra note 2.) This addendum was prepared nearly three months after the State terminated SJV's right to complete the Project. (Trial Ex. 10.)
B. Megger Testing
The State next points to its Trial Exhibit 34, the Megger Testing Report conducted in October of 2000 as justification for terminating its contract with SJV. The tests were performed at the request of Defendant National Grange's consultant, PI Associates. Joe Walsh, Jr. of James J. O'Rourke, Inc. performed the tests and testified at trial as to the conditions under which the tests were conducted, as well as the outcome of the testing. Although Mr. Walsh admits that there was a light rain the day of the testing, he testified that the moisture would not likely have affected the test results. Mr. Walsh provided the Court with a break down of the test report, explaining the various feeder cables for the five docks that were the subject of his testing. Ultimately, Mr. Walsh reported to the Court that eleven of the wires failed the testing.
As the timeline of events in this case suggests, K-Electric had begun work on the Project as the replacement contractor more than two months prior to the administration of the Megger Testing done by O'Rourke, Inc. The State, nevertheless, asks this Court to draw the "reasonable inference" that Mr. Viveiros' presence at the site the day of the testing would have prompted him to raise any objection to the results having been impacted by SJV's work thereon. The State suggests that the test day was SJV's opportunity to raise any such concerns and failure to point *Page 13 
out at that time that K-Electric's work may have impacted the outcome of the test results should be considered by this Court to be an acquiescence to their responsibility.
The Court declines to draw such an inference. SJV cannot be held responsible for the testing results done in late October 2000. At the time the test was conducted, SJV was no longer at work on the Project. In fact, K-Electric had been on-site for more than two months. The State has failed to prove by a preponderance of the evidence that the tests adequately and conclusively reflect the negligence of SJV on this Project. Further, the Court finds that the cables may have been altered by any number of events in the time between contract termination and test administration.
 V. Counterclaims
SJV asserts two counterclaims in response to the State's verified complaint: breach of contract and negligence. The Court finds the above stated findings of fact demonstrate a breach of contract by the State herein. Specifically, the State failed to live up to its obligations under the Contract termination provisions. (Trial Ex. A.) Under the terms of the Contract, the State was obligated to give notice to both the Contractor (SJV) and its bonding company (National Grange) in the event that default was to be considered. (Id.) The State failed to so do. The May 25, 2000 termination letter declaring a contractor default did not follow written notice that such termination was imminent. (Trial Ex. 10.) Under the terms of the Performance Bond, as stated above, the Contractor is entitled to notice and a reasonable period within which to remedy any cause for default. (Trial Ex. A.)
The Court agrees with the Defendant that the State has failed to provide it with any cognizable reason for its termination of SJV and finds that the State's termination of SJV's contract was in fact wrongful. As detailed above, the Project plans were flawed from the onset *Page 14 
and once this issue was brought to the attention of State officials and plan designers, SJV was instructed to continue with and expedite the Project to completion. Scott Vivieros, on behalf of SJV, repeatedly voiced his concerns with meeting the fill requirements as set forth in NEC. In fact, Mr. Vivieros organized a test pull to demonstrate the inability of the conduit to Mr. Ricci of the DEM. While at the Project site, Mr. Ricci, at the direction of his supervisors, refused to witness the demonstration by SJV. (Trial Test. Mr. Ricci.) Ultimately, the project was at a standstill as SJV refused to violate the NEC by using the Okonite cable in the manner contemplated by the original plans. SJV's contract was terminated shortly thereafter for "non-performance". (Trial Ex. 10.) Based on the above findings of fact, the Court concludes that SJV was correct to press its objection to the original plan specifications.
The Court notes that the State did not require its replacement contractor, K-Electric, to install the cable in the manner that SJV had argued was in violation of the NEC. In fact, it gave K-Electric new plans that comported with the code regulations. The State, moreover, failed to mitigate any damages by allowing K-Electric to reconstruct much of the work that was already in place by SJV without showing it was inadequate. In fact, as Plaintiff's Trial Exhibit 12 demonstrates, additional cost to the State as a result of this work was substantial and resulted from the State's breach of its contract with SJV.
 VI. Conclusions of Law
In conclusion, the State has not carried its burden of proving, by a preponderance of the evidence, that the Defendants materially breached either the terms of their contract or any warranty for fitness of a particular purpose. Additionally, the State has failed to establish that the Defendants were negligent and failed to satisfy the duty of care owed to State as electrical *Page 15 
contractors. The evidence before the Court does not support a finding in favor of the State herein. The Court finds in favor of the Defendant SJV on its counterclaim for breach of contract against the State of Rhode Island in the amount of $15,680.38[7] plus costs, statutory interest running from May 25, 2000, and attorney's fees. (See G.L. 1956 §42-92-1.) Because the Court has found in favor of Defendant SJV, the principal on the bond, the Court need not address the defenses raised by co-defendant National Grange, who as surety could only have been subjected to liability in the event that SJV was found liable. Moreover, in light of this decision, the Court need not rule on the co-defendants' Rule 52(c) Motion for Judgment as a Matter of Law as they have prevailed at trial. Order and Judgment to enter consistent with this decision after Defendant SJV files its bill of costs and application for counsel fees.
[1] The NEC specifies fill requirements for raceway systems such as the one installed by SJV at Galilee. The fill requirements relate to the area of the conduit in relation to the raceway system and take into account the radius of the raceway and the diameter of the cable to be installed. See John E. Traister et al., Commercial ElectricalWiring, 214-18 (2000).
[2] The NEC designates particular cable types that are appropriate for the direct-burial method; that is, the cable is laid directly into the earth. The jackets of such cables provide adequate protection for the wiring as they are constructed of weather resistant material to avoid damages thereto. The Metal Clad (MC) Okonite cable contemplated in the plans for the Galilee Project meets the direct-burial guidelines and is specified in the NEC as direct-burial ready.
[3] Megger tests are a form of field testing done to predict and locate potential problems in electrical work. A Megger test applies a very high DC voltage, usually 1000, in a very low current across two conductors and determines whether they are properly installed. John J.Winders, Jr., Power Transformers: Principles and Applications, 258 (2002). Megger readings are read in megohms and must be temperature corrected to ensure accuracy. (Id.) The volatge produced by a Meggeris high enough to cause insulation break down if there are gross faults as a result of faulty installation. (Id.)
[4] The Contract is a standard form agreement between owner and contractor and was part of the Project manual, which included specifications for the electrical renovations to the Port of Galilee State Docks. (Trial Ex. 1.)
[5] AIA Document A201-1997 dictates the conditions by which the contract should be carried out. The Contract makes reference to these conditions in particular sections, including the termination or suspension of the contract.
[6] The Court notes that in addition to the change in plan specifications, Addenda No. 2 also called for the installation of four additional floodlights. These lights were beyond the original scope of the work requested of SJV in the initial plans provided by Powers Engineering. (Trial Ex. A.)
[7] This amount represents the sum of the money retained by the State for the work performed by SJV ($12,079.70), the total work done with respect to change order number 2 ($1,406.21), the total work done with respect to work order number 3 ($754.47), and the additional fees incurred by SJV in connection with the test pull of the Okonite cable on February 8, 2000 ($1,440.00). *Page 1